UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re )
)
JAMES H. POST, et ux. )    Case No. 8:03-bk-18550-KRM
)    Chapter 7
         Debtors. )
_____ )

ANDREA P. BAUMAN, )
CHAPTER 7 TRUSTEE, )
)
         Plaintiff. )
)    Adversary No. 04-156
vs. )
)
JAMES H. POST, et. ux. )
)
         Defendants. )
_____ )

## MEMORANDUM OPINION REGARDING OBJECTION TO DEBTORS' DISCHARGE

The debtors filed a joint petition for relief under Chapter 7 on September 8, 2003, principally to discharge up to $930,753 of obligations from personal guarantees of the debts of a failed business.[1]  The trustee argues that the debtors should be denied their Chapter 7 discharge because, in anticipation of filing, they (a) transferred $3,506.50 to

_____

[1]    M.B. Hayes, Inc. was a construction company owned by the debtors.  It became a debtor in possession after filing a Chapter 11 petition on November 9, 2001 (Case No. 01-21054-8P1).  The case was concluded by a liquidation of assets.

their daughter's bank account to prevent their own bank from setting off against the funds, (b) for the same purpose, held eight pre-petition checks totaling $3,287.96 until after the case was filed and then deposited them into a new, undisclosed bank account, and (c) omitted disclosure of these transactions from their Schedules and Statement of Financial Affairs.

After carefully considering the witnesses' testimony and demeanor, and for the reasons set forth below, the Court concludes that the debtors transferred and concealed property from, and of, the bankruptcy estate with the actual intent to hinder, delay, or defraud a creditor and the trustee. The Court also finds that the debtors made a false oath when they knowingly and fraudulently failed to disclose assets of the bankruptcy estate. Accordingly, the debtors will be denied their discharge under Sections 727(a)(2) and (4) of the Bankruptcy Code.

## BACKGROUND

### The Pre-Petition Transfer to Their Daughter's Bank Account

The debtors had an initial meeting with bankruptcy counsel on July 25, 2003, lasting about 30 minutes.[2] Their

---

[2] The debtors retained the services of an experienced bankruptcy attorney who represented them through the filing and the conclusion, after several adjournments, of the Section 341 creditors'

joint petition was filed about five weeks later, on September 8, 2003.   Before the case was filed, the debtors caused an account to be opened at Wachovia Bank in the name of their college-age daughter (the "Wachovia Account").   The debtors deposited $3,506.50 (an insurance check payable to Mr. Post) into this new account, which was also funded with $31,868.25 of their daughter's trust funds.[3]

This account was created for the debtors' benefit so that they could "continue to live" during their bankruptcy case.   The debtors already had a checking account at AmSouth Bank, which was then owed approximately $50,000.   The debtors admitted at trial that they created the Wachovia Account so that AmSouth Bank could not take the $3,506.50 (and the $31,868 "loaned" to them by their daughter) as a setoff against the outstanding debt.   The debtors accessed the Wachovia Account by a debit card and by blank checks that their daughter pre-signed before leaving for college.

---

meeting.   Their attorney died in January 2004, less than five months after the case began.

[3]    Their daughter was the beneficiary of a trust settled by her grandmother.   The debtors had previously "borrowed" money from their daughter and executed promissory notes for the loans.   The daughter filed a proof of claim in the case for these "loans" in the amount of $175,086.62, which was later withdrawn as part of a settlement with the trustee.

3

The debtors did not disclose, in their Schedules or Statement of Financial Affairs ("Statement"), the existence of the Wachovia Account, their deposit of funds into it, or their payments to creditors from that account.[4]   On the petition date, there was approximately $19,994.71 remaining in the account.

## The SunTrust Account

Between August 5, 2003, and the petition date, the debtors received eight checks from third parties totaling $3,287.96.   Three of these checks, totaling $1,930.96, were from UBS Financial Services, Inc. ("UBS"), and represented distributions from certain trust accounts and a money market account.   The debtors held all eight checks until the day after their bankruptcy petition was filed, when they deposited them into a new bank account at SunTrust Bank (the "SunTrust Account").[5]   The Schedules and Statement did not disclose the debtors' possession of these eight checks on the petition date.

---

[4]      In the five weeks before the petition date, the debtors made debt-service payments from this account on a boat, a 2003 VW Passat, and various credit cards.

[5]      Mr. Post admitted that the checks were held in a drawer at their home until after the petition was filed.

Schedule B did disclose the trust accounts and money market account at UBS, but listed the balances of each account as "zero," even though there was an aggregate balance of about $1,930.96 on the day the debtors signed the Schedules. Between the time of signing the Schedules and the petition date, the debtors received the aggregate balance in the UBS accounts ($1,930.96) which made the scheduled amounts "accurate." The debtors then deposited the funds, post-petition, into the undisclosed SunTrust Account.

Other Failures to Disclose

The debtors did not disclose that, within the year before filing, they had transferred title to a 2001 BMW to their daughter for no consideration. The car was wrecked after the petition date and the debtors received $26,723 of insurance proceeds, which they used to buy their daughter a new BMW. The debtors maintain that the 2001 BMW was actually purchased by the grandmother for their daughter's 16th birthday and that they only held title as "trustees" for their daughter.

The debtors did not disclose that they owned season tickets for the Tampa Bay Buccaneers and the University of

South Florida Bulls football games.[6]  The debtors sold these ticket packages after the petition date without the trustee's knowledge.[7]

The debtors failed to disclose that they had been making payments from the Wachovia Account for debt service on a boat, a 2003 VW Passat, and various credit cards.  The boat, encumbered by a bank's lien, was disclosed in Schedule B; but, a trailer owned free and clear was not.

The Schedules also omitted disclosure of Mr. Post's interest in M.B. Hayes, Inc., his defunct construction company, and two other entities, Mylandco, Inc., and NKL Consulting, Inc. ("NKL").[8]  Mr. Post maintained that he did not believe that NKL was "active" at the time he signed the petition; but, on the day after their petition was filed, the debtors deposited $1,000 from the Wachovia Account into NKL's checking account.

---

[6]      The Bucs tickets were "owned" by the defunct M.B. Hayes, Inc.

[7]      The debtors paid $1,200 for the Bucs tickets and $2,377 for the Bulls tickets.  The record does not establish how much the debtors sold the ticket packages for or how much the debtors later turned over to the trustee.

[8]      The debtors later amended their Statement to reflect their interest in M.B. Hayes, Inc., and Mylandco, Inc.  However, the debtors never disclosed their interest in NKL.

## The Trustee's Recovery Efforts

The Section 341 creditors' meeting was originally scheduled for October 9, 2003; it was not concluded until December 19, 2003, after four adjournments.[9]  In January 2004, the debtors' initial bankruptcy counsel died.   In February 2004, the debtors were examined under oath by the two largest unsecured creditors, pursuant to Federal Rule of Bankruptcy Procedure 2004.[10]

As a result of these inquires, and after reviewing records obtained from third parties, the trustee filed this adversary proceeding on March 19, 2004.  The complaint sought denial of the debtors' discharge, recovery (or the turnover) of assets from the debtors' daughter, recovery of post-petition transfers, and injunctive relief.  After discovering the SunTrust Account, the trustee filed a second adversary proceeding against the debtors, SunTrust Bank, and UBS for recovery of the assets and injunctive relief against further transfers.

---

[9]    Transcripts of the Section 341 meeting were filed in the main case on December 23, 2003 (Document No. 52).

[10]    A transcript of the Rule 2004 examination was filed on March 28, 2005.

Ultimately, the debtors paid the trustee an aggregate amount roughly equal to the funds that they had deposited into the SunTrust Account and the sales proceeds of the football ticket packages. The second adversary proceeding was later dismissed.

The Court then ordered the parties to mediation, which resulted in a settlement of the monetary claims against the daughter: she paid $22,500 to the estate and withdrew her $175,086.62 claim.[11]   This left for adjudication only the trustee's objection to the debtors' discharge.

DISCUSSION

Section 727(a)(2)

A debtor in a Chapter 7 case is entitled to a discharge of debts unless:

> (2)   the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate..., has transferred...or concealed...
>
> (A)   property of the debtor, within one year before the date of filing of the petition; or

---

[11]   There are only six filed claims remaining in this case: VW Credit, $6,804.92; Ford Motor Credit Co., $13,696.11; Discover Financial Services, $576.84; Discover Financial Services, $5,848.32; WAMCO XXVIII, Ltd., $851,555.52; Cumberland Casualty & Surety, $79,198.45.

> (B) property of the estate, after
> the date of the filing of the petition....

11 U.S.C. § 727(a)(2).

To deny the debtors' discharge, the objecting party (in this case the trustee) must prove by a preponderance of evidence that: (1) a transfer occurred; (2) if the transfer was made within one year before the filing, that it was of property of the debtor or, if after the filing of the petition, that it was property of the estate; and (3) at the time of the transfer the debtor possessed the requisite intent to hinder, delay, or defraud a creditor. *See First Florida Bank, N.A. v. Rowe (In re Rowe)*, 81 B.R. 653, 657 (Bankr. M.D. Fla. 1987).

Although actual, subjective intent -- to hinder, delay or defraud a creditor -- must be shown, it can be proven through circumstantial evidence or inferences drawn from a course of conduct.[12] *See Turner v. Moeritz (In re Moeritz)*, 317 B.R. 177, 183 (Bankr. M.D. Fla. 2004); *Caterpillar, Inc. v. Gonzalez (In re Gonzalez)*, 302 B.R. 745, 751-752 (Bankr. S.D. Fla. 2003)(citing *In re Krehl*, 86 F.3d 737, 743 (7th Cir. 1996)).

---

[12] The burden of proof is by preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991).

It is sometimes said that *fraudulent* intent is required to deny a debtor's discharge under Section 727(a)(2). *In re Moeritz*, 317 B.R. at 183. But, the statute reads in the disjunctive – hinder, delay, *or* defraud. Thus, a transfer or concealment made with the actual intent to hinder or delay a creditor is sufficient for denial of the discharge, even if there is no actual fraudulent intent. *See NCNB Texas Nat'l Bank v. Bowyer (In re Bowyer)*, 916 F.2d 1056, 1059 (5th Cir. 1990), *rev'd on other grounds*, 932 F.2d 1100 (5th Cir. 1991); *Crews v. First Colony Life Ins. Co. (In re Barker)*, 168 B.R. 773, 780 (Bankr. M.D. Fla. 1994)(denying the debtor's discharge because he intended to hinder or delay a creditor when he transferred funds from a stock holding to an annuity).

The Court rejects the debtors' assertion that because more than $3,506.50 had been spent from the Wachovia Account prior to the petition date, the debtor's deposit could not have been concealed from the trustee. The funds in the Wachovia Account totaled about $35,374 when the account was opened, including the funds from their daughter ($31,868) and from the insurance check payable to Mr. Post ($3,506.50). These monies were commingled. They were fungible. The balance in the Wachovia Account on the bankruptcy petition date was about $20,000. There is no basis for designating the first dollars

drawn form the account to the insurance check deposited into the Wachovia Account. The Court finds that the debtors' $3,506.50 deposited into the Wachovia Account became property of the estate on the petition date and was concealed from the trustee for some time thereafter.[13]

At trial, both debtors admitted that they deposited their $3,506.50 check into the Wachovia Account to prevent AmSouth Bank from taking a setoff. When Mr. Post was asked at trial why he deposited his insurance check into the Wachovia Account, he responded:

> A: I knew once I filed, [AmSouth was] going to seize any money that was going to be in the AmSouth account. I didn't want them to seize my money.
>
> Q: So, you knew that it would have been seized and you wanted to move it away from them, is that correct?
>
> A: Away from AmSouth, absolutely.

When Ms. Post was questioned about the same check, she testified that it was not deposited into their AmSouth account

---

[13] The trustee also contends that the debtors concealed the $31,868.25 "loan" that was deposited into the Wachovia Account. Although the debtors had access to the account and used it at will, the funds belonged to their daughter and always remained in her own account. The daughter only relinquished control of the funds as they were spent by her parents. The Court finds that the daughter's funds, deposited into the daughter's account, did not become the debtors' property until each time the debtors' used the funds. The debtors' use of these funds before or after the petition date does not raise an issue under Section 727(a)(2).

"because we were closing out our AmSouth account because we owed AmSouth money for a credit line...."

The $3,287.96 that was deposited into the SunTrust Account after the petition date was an asset of the debtors' bankruptcy estate. The debtors did not disclose in their Schedules that they had these assets (the eight checks) in their possession on the petition date. In fact, the debtors did not disclose those assets to the trustee until after the second adjourned creditors' meeting, and after the trustee had subpoenaed the bank's records.

Mr. Post testified that he did not turn over the three UBS checks because he "knew that some point down the road there would be payment above the personal exemptions." He was unable to explain, however, how the trustee would have known to demand the turnover of these funds since the Schedules were marked with "zeros" for the account balances.

Intent to hinder, delay, or defraud the trustee regarding the funds in the Wachovia and SunTrust Accounts can be inferred from the debtors' course of conduct. The debtors had several opportunities to come forward and disclose these assets; instead, this information had to be pried from them over multiple creditors' meetings and Rule 2004 examinations.

The debtors were not forthright with the trustee about these accounts. Mr. Post testified at the meeting of creditors, twice, that the UBS trusts had no value. At the first meeting of creditors, on October 9, 2003, he testified:

> "Q. [by Ms. Bauman]: What are the assets of your trust?
>
> A. [by Mr. Post]: None.
>
> Q. Have you distributed any of the earnings of the trust to yourself?
>
> A. No, all the stock was sold and money put into the company."

When the trustee later discovered that the SunTrust Account was opened the day after the bankruptcy filing, the debtors responded that the deposit was generated by their tax refund which had been turned over to the trustee. The trustee learned the true nature of the concealment after she subpoenaed the deposit detail from the bank: that the debtors had held eight pre-petition checks, waited until one day after filing their petition to negotiate them, and spent the money thereafter.

Mr. Post testified that he intended to amend Schedule B to reflect the balances of the trusts and money market account. Mr. Post testified he even discussed it with counsel who failed to prepare the appropriate amendment. Mr.

13

Post could not reconcile his stated intent to amend, while concealing and spending the funds that were, according to him, to be reflected in the amendment.

The debtors seek to excuse these transactions by blaming their former counsel, who died about five months after the petition date. There is no evidence, however, that their attorney advised them to transfer $3,506.50 to a new, undisclosed account in their daughter's name or to conceal the eight checks deposited into the SunTrust Account. In fact, Ms. Post testified that she did not inform counsel that the accounts were created.

The Court finds that the debtors concealed from the estate a total of $6,794.46 that was deposited into the Wachovia and SunTrust Accounts. These were new, undisclosed accounts created for the purpose of keeping the money after the Chapter 7 filing. The debtors readily admit that the pre-petition deposit of Mr. Post's $3,506.50 check into the Wachovia Account was a transfer of property of the debtors and that the eight checks deposited with SunTrust Bank were property of the estate. They retained control over the funds, and spent them, after the petition date.

The requisite intent under Section 727(a)(2) can be inferred from the relevant circumstances, including: (a) the

omission of these transactions from the Schedules and Statement; (b) the lack of forthright responses, as the trustee began focusing on recoverable assets; (c) the signing of the Schedules, under penalty of perjury, asserting "zero" balances in the UBS accounts when the aggregate balance was about $1,930.96, then receiving the $1,930.96 to make the Schedules "accurate" as filed, and then not disclosing possession of those funds; and (d) the debtors' admissions that this was done purposely to keep money from at least one creditor, AmSouth Bank.

The Court finds that there is a pattern of conduct which evidences actual intent to hinder, delay, or defraud a creditor and the trustee. Accordingly, the debtors' discharge is denied pursuant to Section 727(a)(2).

Section 727(a)(4)

The trustee must establish, by a preponderance of the evidence, that the debtors knowingly and fraudulently made a materially false statement under oath. 11 U.S.C. § 727(a)(4); *Grogan v. Garner*, 498 U.S. 279 (1991). Actual fraudulent intent -- not the lesser intent of Section 727(a)(2) to delay or hinder a creditor or the trustee -- is required.

The debtors failed to disclose certain assets (particularly, the cash in the Wachovia Account and the checks they were holding on the petition date) and debts owed to their daughter and several credit card issuers. These nondisclosures are material.[14] By their omissions, the debtors forced the trustee to "hoof it," by expending considerable time and effort to figure out transactions that should have been disclosed from the outset.

A false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent. *Carney v. Dupree (In re Dupree)*, 336 B.R. 506, 513 (Bankr. M.D. Fla. 2005). A debtor's reliance on the advice of counsel who is generally aware of all relevant facts also may excuse an inaccurate or false oath, because it indicates the absence of the necessary fraudulent intent. *See In re Topper*, 229 F.2d 691, 693 (3d Cir. 1956); *In re Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974)(rebutting inference of fraud when debtor acted

---

[14] An omission is material if it relates to the debtors' business transactions, or if it concerns the discovery of assets, business dealings, or the existence or disposition of property of the debtors. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (finding material omission when debtor failed to disclose interests in valueless corporations as such disclosure would have provided information necessary to determine the debtor's financial condition); *Crews v. Stevens (In re Stevens)*, 250 B.R. 750, 755 (Bankr. M.D. Fla. 2000) (finding that the threshold for materiality is "low:" a fact is material if it bears a direct relationship to the bankruptcy estate).

on the advice of counsel who had been advised of all facts).
It may be that a debtor's description of the transaction
caused his attorney to improperly analyze the transaction;
but, absent evidence that the debtor attempted to mislead his
counsel, the requisite intent cannot be inferred from the
failure to disclose. *Estate of Harris v. Dawley (In re
Dawley)*, 312 B.R. 765, 787 (Bankr. E.D. Pa. 2004).

A reckless disregard of both the serious nature of
the information sought and the necessary attention to detail
and accuracy in answering may rise to the level of fraudulent
intent necessary to bar the discharge. *See Jordan v. Bren (In
re Bren)*, 122 F.App'x 285, 288 (8th Cir. 2005)(finding
fraudulent intent in debtor's ignorance as to whether
significant assets or transfers were reported on his schedules
was reckless and potentially willful). *Cadle Co. v.
Leffingwell (In re Leffingwell)*, 279 B.R. 328, 351 (Bankr.
M.D. Fla. 2002)(finding the requisite fraudulent intent under
Section 727(a)(4) by debtor's reckless indifference for the
truth); *Youngblood v. Hembree (In re Hembree)*, 186 B.R. 530,
532 (Bankr. M.D. Fla. 1995)(noting a series of omissions, when
examined together, can demonstrate a reckless disregard for
the truth that is equivalent to fraudulent intent).

A debtor's schedules need not be perfect.  The issue is one of intent:  are the omissions merely mistakes or the result of deliberate and purposeful intent?

Both of the debtors testified that the initial consultation with their bankruptcy attorney lasted only twenty to thirty minutes.  Ms. Post testified that she disclosed the fact that they were borrowing money from their daughter and that she maintained custodial accounts for their children. Mr. Post testified that he believed their case would be difficult because they had a business that went bad; several creditors were coming after them; and that their daughter had significant assets.

The debtors testified that their counsel said "don't list anything that has anything to do with your children." When the debtors explained they had title to their daughter's car that had been purchased by the grandmother, their lawyer said "do not put it on there."  They now maintain that counsel did not explain how to fill out the Schedules, and that he did not consult with them when they signed the Schedules and Statement.

As defendants' expert, bankruptcy lawyer Bernard Morse, opined:  bankruptcy schedules are complicated and "in a lot of cases don't relate to the way most people in real life

think of their assets and liabilities..." and "are very technical forms; are very difficult to fill out."

In fact, the Schedules, as filed, differ from the "questionnaire" the debtors returned to their lawyer. The questionnaire, filled out by Mr. Post, listed positive values for the UBS trust accounts and for other assets totaling more than $20,000. But, the values for these same items in Schedule B, as filed, were either "zero," for the UBS accounts, or significantly diminished, for other assets. It is unclear just how the debtors were involved in these revisions of values. The debtors testified that they did not advise their lawyer to change the values they wrote in the questionnaire.

Based on the circumstances of this case -- the inconsistencies between the questionnaire filled out by the debtors and the Schedules that were filed, the delay between the debtors' signing of the Schedules and their filing, and the testimony of the debtors and their expert suggesting that their bankruptcy lawyer may not have given them sufficiently thorough advice, and bankruptcy counsel's death five months after the filing -- the Court concludes that it is likely that the debtors were not given thorough guidance in the preparation of their Schedules or Statement.

Most of the errors in the Schedules (disclosing the boat, but not the trailer; omitting the largely defunct corporations; omitting certain creditors who were being paid on a current basis; omitting the debtors' title to their daughter's car) appear to be the result of mistakes, negligence, or the misunderstood advice of counsel.

The debtors' failure to disclose the eight checks they held until they created the SunTrust Account one day after filing their petition stands on a different footing. The debtors deliberately did not tell their lawyer beforehand about the SunTrust Account or the $3,287.96 worth of personal checks they were holding.  Although the dollar amount may not be substantial, it is material.   It was not a simple mistake or coincidence -- the debtors knew they were holding the checks, they knew they wanted to keep the money out of the bankruptcy estate, and they knew just when to open the account.   Such nondisclosure establishes the requisite fraudulent intent.

The debtors signed their petition, under penalty of perjury, asserting that the Schedules were complete while deliberately concealing the existence of the eight pre-petition checks.  Such nondisclosure constitutes a false oath under Section 727(a)(4) as it was a deliberate and fraudulent

concealment of property of the bankruptcy estate. Accordingly, the debtors' discharge is denied pursuant to Section 727(a)(4).

## CONCLUSION

By their own admission, the debtors intentionally transferred and concealed assets from their bankruptcy estate with the actual intent to hinder, delay, or defraud at least one creditor and the trustee. The debtors' made a false oath when they knowingly and fraudulently failed to disclose assets (the eight checks totaling $3,287.96) on their Schedules. Accordingly, the debtors will be denied their discharge under Sections 727(a)(2) and (4). The Court will enter a separate judgment in accordance with this Memorandum Opinion.

DONE and ORDERED in Tampa, Florida, this _10th_ day of _August_____, 2006.

K. RODNEY MAY
United States Bankruptcy Judge

21

Copies Furnished To:

Herbert R. Donica, Esquire, Attorney for Plaintiff, 106 S.
Tampania Avenue, #250, Tampa, Florida  33609

Buddy D. Ford, Esquire, Attorney for Defendants, 115 N.
MacDill Avenue, Tampa, Florida  33609

Sheila D. Norman, Esquire, Attorney for Defendants, 1905 W.
Kennedy Boulevard, Tampa, Florida  33606-1530